**Jesse A. VAIL, Plaintiff-Appellee,**

**v.**

**BOARD OF EDUCATION OF PARIS UNION SCHOOL DISTRICT NO. 95, Terrance C. Parks, Charles R. Fox and Bernie Rinehart, Defendants-Appellants.**

No. 82–1202.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1982.

Decided April 19, 1983.

**1436**

Thomas R. Miller, Miller & Tracy, Monticello, Ill., for defendants-appellants.

Marc J. Ansel, Champaign, Ill., for plaintiff-appellee.

Before WOOD, ESCHBACH and POSNER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

In this § 1983 action this court must once again address the meaning of "property" as used in the Due Process Clause. The district court in a bench trial awarded $19,-850.99 in damages for the unlawful termination of the plaintiff-appellee from a position in the school system of Paris, Illinois. We affirm.

**I.**

This case arose because of the efforts of the Board of Education of Paris Union School District No. 95 (Board) to secure the services of the plaintiff-appellee Jesse A. Vail (Vail) as an athletic director and football coach. At the time the Board sought his services Vail was employed as supervisor of recreation and physical education for the Stateville Correctional Center in Joliet, Illinois.

On June 15, 1980 a search committee for the Board traveled to Joliet. They held a breakfast meeting with Vail, visited his place of employment, and later met with Vail in his home. In addition to talking about the nature of the job duties and the salary, discussion between the search committee and Vail centered on job security and the length of the term of the proposed contract.

Vail was concerned about the amount of time necessary to correct deficiencies that existed in the athletic program in Paris as well as giving up his job at Stateville. In response to these concerns the committee stated that the length of the term of the contract was a matter to be determined by the full Board and that the committee itself could make no commitment beyond one year.

According to the findings of fact, on June 24, 1980 the Board met in special session to consider hiring Vail. At that meeting the Board unanimously agreed to offer Vail a contract of employment as athletic director and football coach. It was the consensus of the Board that it would assure Vail of two years in that position.

The Board instructed Dr. James Cherry, the superintendent, to convey an offer to Vail and to explain the Board's intention to renew the one-year contract at the end of the first year. Vail was informed of the offer and told that while the Board could not offer him more than a one year contract, it could assure him of extending the contract for a second year. Vail accepted, traveled to Paris to execute a written contract, and subsequently assumed the duties of athletic director and football coach.

On March 2, 1981 the Board met in public session and voted not to renew Vail's contract for the ensuing year. Vail was not given any explanation as to the reason for his termination, nor was he given any sort of a hearing.

## II.

On these findings of fact the district court held that Vail had a constitutionally protected property interest in his continued employment with the Board. Citing *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the court held that the Board acting under color of state law had deprived Vail of property without due process of law and awarded $19,850.99 in stipulated damages.

The Board's principal argument on appeal is that the district court erred in concluding that Vail had any constitutionally sufficient property interest to state a claim under 42 U.S.C. § 1983. The Board contends that Vail had no more than a mere subjective expectation of continued employment and his sole rights as a new teacher are governed by Illinois law which only requires the Board to give 60 days notice before the end of a school term of its decision to terminate.[1]

The nature of property interests to be protected by the Due Process Clause of the Constitution has been addressed in many contexts by the Supreme Court. Most relevant to the present case are a pair of cases where the Court assessed the property interests of two state university professors each terminated at the end of a one-year contract without a hearing. In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Court held that a teacher terminated after one year had no property interest in his continued employment where his unilateral expectations had no basis in statute, contract, or mutually explicit understanding with the university. *Id.* at 578, 92 S.Ct. at 2709. In the companion case, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the plaintiff had been terminated after having worked for a number of years under a series of one-year contracts. Here the Court found a property interest in continued employment that had been fostered by the rules and the policy of the university,

despite the lack of tenure or a contractual provision. *Id.* at 599–601, 92 S.Ct. at 2698–2699.

In defining the nature of a protected property interest Justice Stewart stated in *Sindermann:*

> We have made clear in *Roth,* that "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather "property" denotes a broad range of interests that are secured by "existing rules or understandings." A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

408 U.S. at 601, 92 S.Ct. at 2699 (citations omitted). Justice Stewart went on to state that the "existing rules or understandings" need not be a formal tenure system or even an explicit contractual provision, citing implied contracts as sufficient to constitute a protected property interest. *Id.* at 601–02, 92 S.Ct. at 2699–2700. *See also Connell v. Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) (applying due process to teacher without tenure or a formal contract but with a clearly implied promise of continuing employment).

*Sindermann* does not turn on the implied contractual provision being one of tenure. The case law clearly establishes that a property interest can be created through a statutory entitlement, the operation of institutional common law, or through principles of contract law. In addition to *Sindermann* the Supreme Court has stated explicitly: "A property interest in employment can, of course, be created by ordinance or by an implied contract." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). *Accord, Jago v. Van Curen,* 454 U.S. 14, 18–19, 102 S.Ct. 31, 34–35, 70 L.Ed.2d 13 (1981) (*per curiam* ); *Leis v. Flynt,* 439 U.S. 438, 442, 99 S.Ct. 698, 700,

---

1. There is no contention that the Board failed to act in compliance with this requirement.

*See, infra,* p. 1439.

**1438**

58 L.Ed.2d 717 (1979) (*per curiam*). It is the binding nature of the contract rather than its length which is significant. This circuit has also stated rather bluntly: "A term of employment set by contract has been recognized as a property interest which the state cannot extinguish without conforming to the dictates of procedural due process." *Hostrop v. Board of Junior College District No. 515*, 471 F.2d 488, 494 (7th Cir.1972), *cert. denied*, 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973). *Accord, Adams v. Walker*, 492 F.2d 1003 (7th Cir. 1974).

▪ In this case we deal with the unlawful termination of a government employee, not some other matter of state business, a subject which the Supreme Court repeatedly has held to implicate constitutional rights under both the "property" and the "liberty" interests protected by the Due Process Clause. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Roth, supra; Sindermann*, 408 U.S. at 597, 92 S.Ct. at 2697 and cases cited therein; *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). *Cf. Hampton v. Mow Sun Wong*, 426 U.S. 88, 102, 96 S.Ct. 1895, 1904, 48 L.Ed.2d 495 (1976) (liberty interest in obtaining government employment). When the government acts as employer, the application of the Due Process Clause protects the individual from arbitrary and capricious conduct and legitimizes governmental action when exercised through proper channels.

▪ Vail had a two-year employment promise rather than a commitment for indefinite employment, as in the case of tenure. The length of time that an individual retains an asset affects the *weight* or *value* of the interest, but not the *nature* of the interest. Had Vail been successful in rebuilding the school's athletic program to the school's satisfaction, as no doubt all parties hopefully anticipated, Vail would have benefited after two years from statutory tenure, as do other teachers. Athletic directors and coaches are generally not regarded as second class members of a balanced school program. *Roth*, 408 U.S. at 570–71, 92 S.Ct.

at 2705–06. We affirm the finding that the Board deprived Vail of his legitimate expectation of continued employment in terminating him without cause before the expiration of his employment period, and that such deprivation is a violation of due process and actionable under the Civil Rights Act.

▪ The Board argues that under Illinois law there was no evidence of an implied employment contract for two years. Under Illinois law, an implied contract is proven by circumstances showing that the parties intended to contract or by facts and circumstances from which a meeting of the minds can be inferred. *See generally,* 12 Illinois Law & Practice *Contracts* § 4 (1982); *United States ex rel. J.C. Schaefer Electric, Inc. v. O. Frank Heinz Construction Co.*, 300 F.Supp. 396 (S.D.Ill.1969); *Arthur Rubloff & Co. v. Drovers National Bank*, 80 Ill.App.3d 867, 36 Ill.Dec. 194, 400 N.E.2d 614 (1st Dist.1980). While it is true that property interests stem from rules and understandings governed by state law, the Illinois law of implied contracts is quite sufficient in this case to create a property interest protected under 42 U.S.C. § 1983.

What the Board actually challenges is the district court's findings of fact. After analyzing conflicting evidence on the question of the deliberations of the Board and the representations made to Vail concerning the length of his employment, the district court credited the testimony of certain Board members, Davis and McHenry. This decision was based on the demeanor of the witnesses as well as lack of recollection and impeachment on certain points testified to by the opposing witnesses. A credibility finding is a finding of fact which, under Rule 52 of Federal Rules of Civil Procedure, "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52. Based on the record in this case we cannot reverse these findings as clearly erroneous.

### III.

The Board argues that even if an implied contract is found between Vail and the Board that the contract is unenforceable under Illinois law and therefore not sufficient to constitute a property interest. First, the Board contends that the provisions of the Illinois Teacher Tenure Act, Ill.Rev.Stat. ch. 122, § 24–11 (1979), preempt any property interest created by the implied contract. Such a conclusion is not supported by § 24–11 or any other provision of the Illinois School Code, Ill.Rev.Stat. ch. 122, § 1–1 *et seq.* (1979).

Section 24–11 itself contemplates just such a two-year probationary period as was promised Vail. The statute states:

> Any teacher who has been employed in any district as a full-time teacher for a probationary period of 2 consecutive school terms[2] shall enter upon contractual continued service unless given written notice of dismissal stating the specific reason, therefor, by registered mail by the employing board at least 60 days before the end of such period.

Ill.Rev.Stat. ch. 122, § 24–11 (1979). The fact that the same section provides a different procedure to terminate probationary teachers during their first year of teaching does not suggest that a two-year contract is not permitted under Illinois law.[3] It is significant that Vail is not claiming any

right to tenure under the Code which would have been extinguished by the actions of the Board in compliance with § 24–11. He merely claims an agreement for a two-year contract as promised by the Board. There is simply no provision of the Code placing an express statutory one-year time limit on contracts to be offered to probationary teachers.[4]

The Board also argues that any implied contract would be unenforceable because it arises from an *ultra vires* Board act. The appellants contend that a two-year contract would be an *ultra vires* limitation on the Board's ability to terminate teachers at will. Appellants cite the provision of § 10–22.4 as granting the Board discretionary power to dismiss, or to fail to renew a teacher's employment. While it is true that these powers cannot be delegated or contracted away to a third party, the Board's exercise of its discretion in this case in offering a two-year contract in no way violates the express or implied requirement of § 10–22. *See Libertyville Education Association v. Board of Education of School District No. 70, Lake County,* 56 Ill.App.3d 503, 13 Ill.Dec. 741, 371 N.E.2d 676 (2d Dist.1977).

Appellant's final contention is that the oral promise to renew employment after the first year is unenforceable under the

---

**2.** A term is defined as "the portion of the school year, July 1 to the following June 30, when school is in actual session." Ill.Rev.Stat. ch. 122, § 24–11 (1979).

**3.** The Board relies on the portion of that section which states:

> Any full-time teacher who is completing the first year of the probationary period described in the preceding paragraph, or any teacher employed on a full-time basis not later than January 1 of the school term, shall receive written notice from the employing board at least 60 days before the end of any school term whether or not he will be re-employed for the following school term. If the board fails to give such notice, the employee shall be deemed re-employed, and not later than the close of the then current school term the board shall issue a regular contract to the employee as though the board had re-employed him in the usual manner.

**4.** Appellant's citation of our decision in *McElearney v. University of Illinois, Chicago Circle,* 612 F.2d 285 (7th Cir.1979), is therefore inapposite. First, and foremost, McElearney received only "informal assurance" in contrast to the instant case in which Vail received promises which rose to the level of an implied contract. Second, the explicit rules governing *tenure* in *McElearney* suggest that any reliance to be based on a supposed entitlement to *tenure* by virtue of the informal assurances McElearney received would be unreasonable. Finally, our holding in *Hostrop v. Board of Junior College District No. 515,* 523 F.2d 569 (7th Cir.1975), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976), suggests that a cause of action for state action in violation of due process would exist even if Illinois law only permitted a one-year contract.

Illinois Statute of Frauds.[5] This argument has no merit given, under Illinois law, as elsewhere, the Statute of Frauds would not bar enforcement of the contract where there has been partial performance by the parties. *Anastaplo v. Radford,* 14 Ill.2d 526, 153 N.E.2d 37 (1958); *Yorkville National Bank v. Schaefer,* 71 Ill.App.3d 137, 27 Ill.Dec. 263, 388 N.E.2d 1312 (2d Dist.1979); *Grundy County National Bank v. Westfall,* 13 Ill.App.3d 839, 301 N.E.2d 28 (3rd Dist. 1973).

Even if we were to assume *arguendo* that no *enforceable* contract under state law existed between Vail and the Board, we are not prepared to hold that this alone precludes the establishment of a protected property interest. The Civil Rights Act itself speaks of actions taken under *color* of state law and not under authority of state law. The Supreme Court has stated:

> Although the underlying substantive interest is created by "an independent source such as state law," federal constitutional law determines whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.

*Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978).

More recently, the Court has refused to limit constitutional "property" rights to mere contract rights. *Jago v. Van Curen,* 454 U.S. 14, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981). Legitimate and reasonable reliance on a promise from the state can be the source of property rights protected under the Due Process Clause and the civil rights statutes. *Sindermann,* 408 U.S. at 602, 92 S.Ct. at 2700. In *Soni v. Board of Trustees of the University of Tennessee,* 513 F.2d 347 (6th Cir.1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976), the court held that reasonable reliance on assurances and conduct by university officials that the plaintiff had a tenure track position was sufficient to create a property interest despite state law and university regulations which prohibited an alien from receiving such an appointment. *See also Harris v. Arizona Board of Regents,* 528 F.Supp. 987 (D.Ariz.1981). Our own decision in *McElearney v. University of Illinois, Chicago Circle,* 612 F.2d 285 (7th Cir.1979), is in no way inconsistent with this reliance standard given that the plaintiff in *McElearney* received only informal assurances thus failing to meet the legitimate and reasonable reliance necessary to create a property interest.

The actions of the Board worked to deny Vail's legitimate expectations of continued employment. The extent of his reliance on the Board's promise is shown by the fact he left Joliet where he and his family had lived for thirteen years, left a job he had held for ten years, and even took a salary cut to take the job in Paris. The reasonableness of the reliance is illustrated by the concerns over security Vail raised from his very first meeting with Dr. Cherry to the final actions of the Board and the promises Vail received as an inducement to taking the job.

*Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), held a claim was not stated under 42 U.S.C. § 1983 when certain hobby materials ordered by mail by an inmate of a Nebraska prison were not delivered to him due to the unauthorized failure of state agents to follow established state procedures. The remedy was found to lie under state law. In our recent decision in *Wolf-Lillie v. Sonquist,* 699 F.2d 864 (7th Cir.1983), we held that *Parratt* applied to that plaintiff's § 1983 due process allegations. In that case the sheriff had executed a writ of restitution to seize plaintiff's house trailer contrary to the state statute. In both *Parratt* and *Wolf-Lillie* the plaintiffs were relegated to post-deprivation state law tort remedies. Pre-deprivation hearings were neither practical nor appropriate in either case where clearly established state policies were involved and ignored due to negligence or otherwise.

5. Ill.Rev.Stat. ch. 59, § 1 (1981) states:

No action shall be brought ... upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise ... shall be in writing.

We see neither case as controlling the present case. The Supreme Court had the opportunity but refused to expand *Parratt* beyond "a tortious loss of property or result of a random and unauthorized act by a state employee." *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

### IV.

■ Finally, the appellants argue that the district court's award of damages is improper. They contend that the proper remedy in this case is either a hearing to determine whether the termination was justified or a remand to have the plaintiff come forward with proof of actual losses.

The issue of "good cause" having been put into issue by the pleadings and fully tried and decided by the district court negates the need for any further proceedings on this issue. The district court's finding that the Board was in breach of contract and, therefore, that Vail's termination was not for good cause, distinguishes this case from *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The stipulated damages awarded in this case adequately afford a remedy for the harm suffered from the deprivation of Vail's property interest without due process of law.

### V.

Accordingly, this case is

AFFIRMED.

ESCHBACH, Circuit Judge, concurring.

While I join in Judge Wood's opinion, I write separately in order to respond to Judge Posner's strongly worded dissenting opinion. With all respect, I believe that my brother Posner treats this case as if it were one of first impression, and reasoning from fundamental principles concludes that the case does not belong in federal court. The central issue this case presents, however, is not an issue of first impression—this court expressly held in *Hostrop v. Board of Junior College District No. 515,* 471 F.2d 488 (7th Cir.1972), that a term employment contract provides a public employee with a property interest in continued employment during his term and that before such an employee may be discharged he must be afforded a meaningful opportunity to be heard. I believe that *Hostrop* was correctly decided. When I say "correctly" decided, I mean that it was decided in accordance with the authoritative pronouncements of the United States Supreme Court and remains good law in light of subsequent precedent. Whether it was correctly decided in some sort of ultimate jurisprudential or philosophical sense is not within my domain as an intermediate appellate court judge once I have decided that it was properly decided in the former sense. My brother Posner calls this approach to deciding cases "putting the blame on the [Supreme] Court." Post at 1456. I call it adherence to *stare decisis* and to a superior authority.

In light of the fact that Judge Posner believes that my brother Wood and I have engaged in a selective reading of precedent, reading some cases "broadly" and others "narrowly," I shall explain my own understanding of what I consider to be the controlling authority in this case.

In *Roth v. Board of Regents,* 310 F.Supp. 972 (W.D.Wis.1970), *aff'd,* 446 F.2d 806 (7th Cir.1971), *rev'd,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the plaintiff was hired as a teacher at a state college for a one-year term. When college officials did not renew his contract of employment, Roth argued that their refusal to do so violated both his First Amendment rights and his procedural due process rights. Judge Doyle granted Roth's motion for summary judgment on the procedural due process claim and stayed proceedings on the First Amendment claim. Employing the general balancing test of *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), Judge Doyle balanced Roth's interests in being rehired and the state's interests in summary non-retention decisions and concluded that due process required that college officials provide Roth with an explanation for their decision and an opportunity to be heard regarding that decision. Judge

Doyle, while recognizing that the substantive First Amendment claim was a discrete one, also reasoned that requiring a hearing before the decision concerning retention was made would also serve to vindicate important First Amendment interests at stake in the college environment. 310 F.Supp. at 979–80. This court affirmed Judge Doyle's judgment employing essentially the same rationale as the district court. We balanced the grievous loss one suffers when not retained in a job against the need for a summary decision, 446 F.2d at 808–09, and observed that the requirement of a hearing would serve as a "prophylactic" against decisions based on impermissible reasons, *id.* at 810. Judge Duffy dissented, basically arguing that since Roth was not a tenured faculty member, the college officials could deny him re-employment summarily.

The Supreme Court's decision reversing our judgment was a landmark in constitutional jurisprudence. Eschewing a general balancing test for the purpose of determining whether the Fourteenth Amendment mandates procedural protections concerning a state decision which adversely affects an individual, the Court instead held that the threshold question in a procedural due process case is whether an individual has a liberty or property interest at stake. The Court recognized the broad and majestic nature of these terms, but at the same time gave them meaning. The Court ascertained the meaning of property inductively, by examining cases in which procedural due process protections had been accorded even though the cases themselves did not expressly state that the individual interests at stake constituted property.

Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. *Goldberg v. Kelly,* 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287]. *See Flemming v. Nestor,* 363 U.S. 603, 611 [80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435]. Similarly, in the area of public employment, the Court has

held that a public college professor dismissed from an office held under tenure provisions, *Slochower v. Board of Education,* 350 U.S. 551 [76 S.Ct. 637, 100 L.Ed. 692], *and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff,* 344 U.S. 183 [73 S.Ct. 215, 97 L.Ed. 216], have interests in continued employment that are safeguarded by due process. Only last year, the Court held that *this principle "proscribing summary dismissal from public employment without hearing or inquiry required by due process" also applied to a teacher recently hired without tenure or a formal contract, but nonetheless with a clearly implied promise of continued employment. Connell v. Higginbotham,* 403 U.S. 207, 208 [91 S.Ct. 1772, 1773, 29 L.Ed.2d 418].

Certain attributes of "property" interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect *those claims upon which people rely in their daily lives,* reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly, supra,* had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility.

But we held that they had a right to a hearing at which they might attempt to do so.

408 U.S. at 576–77, 92 S.Ct. at 2708–09 (emphasis added) (footnotes omitted).

Having thus formulated the principles governing the identification of property interests for purposes of the due process clause, the Court proceeded to apply these principles to Roth's situation:

> Just as the welfare recipients' "property" interest in welfare payments was created and defined by statutory terms, so the *respondent's "property" interest in employment at Wisconsin State University-Oshkosh was created and defined by the terms of his appointment. Those terms secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30. They did not provide for contract renewal absent "sufficient cause." Indeed, they made no provision for renewal whatsoever.*
>
> Thus, the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

408 U.S. at 578, 92 S.Ct. at 2710 (emphasis added) (footnote omitted).

In my view, the foregoing language is dispositive of the question of whether Vail had a property interest in continued employment in the instant case: the Court's authoritative interpretation of its past precedent concerning the employees dismissed during the term of their contracts, the principles which emerge from those decisions (*i.e.,* that one must have a legitimate claim of entitlement to a benefit and that a purpose of property is to protect those claims upon which people rely in their daily lives), and the application of those principles in the case before it (*i.e.,* that Roth had a property interest during the term of his appointment), all compel that conclusion. Vail has established precisely what Roth failed to establish—a right to renewal of his one-year employment contract.

Judge Posner does not explain what significance he accords to the language of the *Roth* opinion. Rather, he merely states that *Roth* "held that if a state college teacher had no right under state law to continued employment, he had no property right under the due process clause." Post at 1451. That tautological statement, however, is not very instructive, nor does it distinguish *Roth.* He also tells us that "we are not obliged to read Supreme Court decisions broadly in order to reach foolish results." Post at 1452. Aside from those generalities, Judge Posner attempts to distinguish *Roth* by distinguishing *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a companion case to *Roth.*

In *Sindermann,* the plaintiff was employed as a teacher in a state college under a series of one-year contracts. While state law did not provide for a tenure system, Sindermann argued that he had "de facto" tenure because of an understanding fostered by the college administration. Applying the principles announced in *Roth,* the Court emphasized that the

> "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." *Id.* [408 U.S.] at 577 [92 S.Ct. at 2709]. A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing. *Ibid.*

Id. 408 U.S. at 601, 92 S.Ct. at 2699. An implied-in-fact contract, if recognized by state law, was held to create such a claim of entitlement, and Sindermann's allegations on this point were considered sufficient to withstand summary dismissal.

Judge Posner tells us that the "important thing" in *Sindermann* was that plaintiff alleged that he had "tenure" which in Judge Posner's view is "special." The telling deficiency with this interpretation of *Sindermann* is that it finds no support in the Supreme Court's opinion. The language which Judge Posner quotes from *Sindermann* indeed uses the term tenure—it would be awkward to use another word in discussing Sindermann's claim that he had tenure. Sindermann was not contending that he had any express contract for continued employment; he argued he had de facto tenure. Judge Posner's interpretation not only finds no support in the Court's opinion, but is plainly inconsistent with it. First, it puts the *Sindermann* cart before the *Roth* horse. *Roth* announced the principal governing procedural due process cases, a principle which *Sindermann* merely applied to the facts of that case. There can be no doubt that the Supreme Court did not view tenure as "special." In *Roth* itself, the Court stated at the outset of the opinion that Roth "had no tenure rights to continued employment." 408 U.S. at 566, 92 S.Ct. at 2703. Perhaps Judge Posner would have ended his analysis of that case with that fact, as was suggested by the dissenting opinion in this court's consideration of the *Roth* case, but the Supreme Court adopted a far different analysis and did not view the absence of tenure as dispositive. Second, Judge Posner's interpretation is contrary to the Supreme Court's admonition that the property interests protected by the due process clause are not limited by a few rigid, technical forms.

Judge Posner's second, though interrelated basis for distinguishing or perhaps "interpreting" *Roth, Sindermann,* and our decision in *Hostrop* as well, is that those cases involved "teachers" whereas this case involves an athletic coach. A distinction is suggested between academic and non-aca-

demic teachers, and only the former are entitled to the special judicial solicitude which would transform their interests in continued employment into "property" interests. This argument finds some support in the caselaw. It finds its support in a dissenting opinion and the district court's decision in *Hostrop* which this court reversed on the authority of *Roth* and *Sindermann.*

Justice Douglas' dissent in *Roth* emphasizes the importance of academic freedom, 408 U.S. at 582, 92 S.Ct. at 2711 *passim,* and also distinguishes between teachers and other workers in arguing in favor of according Roth a due process right to a hearing notwithstanding the fact he had no claim of entitlement to continued employment. If, in fact, teachers are entitled to special procedural protections to safeguard academic freedom, then a distinction such as that proposed by Justice Douglas would be the logical one to make—and a teacher would be entitled to a hearing on any decision not to retain him, irrespective of whether he had a claim of entitlement to continued employment, and irrespective of state law on the subject. Judge Posner embraces Judge Douglas' distinction, but does not apply it to its logical conclusion. Instead, he argues that the interest a teacher has in continued employment is property but the interest that a non-academic employee has in continued employment is not property. This position has a somewhat familiar ring to it, since it is essentially the position adopted by the district court in *Hostrop,* 337 F.Supp. 977 (N.D.Ill.1972).

In *Hostrop,* a college administrator argued that he was entitled to a hearing prior to termination. The district court, denying relief, distinguished *this* court's decision in *Roth* on the ground that *Roth* involved a professor where the need for academic freedom was implicated; the district court found the administrator less deserving of protection, though it did not speak in property terms. After the Supreme Court's decisions in *Roth* and *Sindermann,* this court reversed. Our decision in *Hostrop,* Judge Posner states, "extended" *Sindermann* to

term employment contracts, and did so "uncritically, without discussion of the distinction I have just noted [between tenure and term contracts]." Post at 1451. Because of these purported factors, Judge Posner does not think we must overrule *Hostrop* in order to hold that a term contract does not create a property interest; rather, we may simply "distinguish" it. First, *Hostrop* does not "extend" *Sindermann;* it applies the authoritative pronouncements of *Roth* to the case before it. Second, there was no reason for *Hostrop* to discuss the distinction Judge Posner would make between long-term and short-term employment relationships, for *Roth* and *Sindermann* make clear that no such doctrinal distinction exists. Third, *Hostrop* is not distinguishable because of the purported greater judicial solicitude that exists for teachers as opposed to other employees—in reversing the district court opinion, this court rejected such a distinction. Fourth, the related "speculat[ion]" that the *Roth, Sindermann,* and *Hostrop* courts treated the First Amendment claims and due process claims as distinct rights "because protection against arbitrary dismissal was thought necessary to prevent infringements of freedom of academic speech that would be too difficult to prove," post at 1452, totally ignores the fact that both the district court and this court advanced that rationale in support of according protection in the *Roth* case itself and the Supreme Court rejected that approach. *See* 408 U.S. at 575 n. 14, 92 S.Ct. at 2708 n. 14. Fifth, regardless of whether *Hostrop* represented an extension of *Roth,* it is the law of this circuit until this court overrules it—it cannot be "distinguished" on the ground that it did not expressly respond to an argument which a later court finds persuasive.

In summary on the property interest question, I believe *Roth* is dispositive, just as this court held in *Hostrop* in a similar case. In this regard, with all due respect to my brother Posner, I believe his opinion on this question resembles more the work of a legal commentator than that of an intermediate appellate court judge. He posits rationales for prior decisions and then concludes that his analysis of the instant case is consistent with those posited rationales, superimposing a unifying doctrinal thread onto the cases which would explain their outcome in a principled fashion. In my view, however, the attempt to engraft his analysis onto those cases ignores the Supreme Court's enunciation of the guiding principles and amounts to substituting his opinion for the ones appearing in the United States Reports. I say this recognizing that often cases are decided on bases which are not fully articulated by the courts rendering the decisions and often after a series of decisions reveal that the rationale expressly embraced by the courts does not reflect the real basis of judgment, the old rationale is finally discarded and a new one takes its place. The law, from time immemorial, has evolved and matured through this process, and indeed *Roth* represents but one example of this process. The Supreme Court may well decide that the principles enunciated in *Roth* should be replaced. Writing, as I am, on the shores of Lake Michigan rather than the banks of the Potomac, I am not free to make that decision.

Judge Posner's second point concerns the nature of the interest created by state contract law and whether Vail was deprived of that precise interest when he was terminated. My examination of Illinois authority convinces me that Judge Posner is correct in concluding that the Illinois courts would not reinstate Vail to his position to serve a second year, but instead would only award money damages. *Bessler v. Board of Education,* 69 Ill.2d 191, 13 Ill.Dec. 23, 370 N.E.2d 1050 (1977). Because money damages would be Vail's sole state remedy, Judge Posner reasons the only right Vail ever had was a right to performance or damages for non-performance. The state has not deprived Vail of that disjunctive right, because it has never "refused" to pay damages in a state court proceeding. There are at least two reasons I find this conception of Vail's interest unpersuasive. First, if state law did provide for reinstatement, then under Judge Posner's analysis Vail still would not be "deprived" of property

until the state courts "refused" to reinstate him. If that is not requiring exhaustion of state remedies, I do not know what would be an exhaustion requirement. Second, I believe that Judge Posner views Vail's legitimate interests created by the contract too narrowly, and exalts abstraction over reality. Vail's dismissal deprived him of his livelihood—a livelihood he could legitimately believe would continue for the term of the agreement unless cause was shown for his termination. His reliance interest in that relationship, with all its significant real life consequences, was destroyed upon his termination.

Judge Posner's last point is a dispute concerning what process is due. He questions the need for a predeprivation hearing in this case. He does not address the analysis of the *Roth* opinion on this subject, 408 U.S. at 569–70, 92 S.Ct. at 2705, nor our analysis in *Hostrop* that a predeprivation hearing is required, 471 F.2d at 494–95 & n. 15. Rather, he primarily contends that we distinguish *Parratt* on the "factitious" ground that it applies only to negligent deprivations of property.

In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Court held that the negligent loss of a prisoner's tangible personalty by the state, acting as a bailee, constituted a deprivation of property within the meaning of the Fourteenth Amendment. It proceeded to consider whether the prisoner should have been given a hearing about the matter before the state lost the property. Thus phrasing the question, the answer is obvious. Framed another, more traditional way, once a deprivation under color of law is established, the issue is what process is due. The Court began its analysis of that question by observing that it had "never directly addressed the question of what process is due a person when an employee of a State negligently takes his property." *Id.* 101 S.Ct. at 1914. To answer *that* question, it first canvassed prior cases in which a predeprivation hearing had been required. "In all these cases," the Court observed, "deprivations of property were authorized by an established state procedure and due process

was held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur." *Id.* The Court then examined cases in which a predeprivation hearing was held unnecessary. "These cases recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process can, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, satisfy the requirements of procedural due process." *Id.* 101 S.Ct. at 1915 (footnote omitted). The court then distinguished between "final" deprivations of property and "initial" deprivations of property, noting that a "meaningful" opportunity to be heard need not always require a hearing before the "initial" deprivation of property. Applying these principles to the case before it, the Court stated:

The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as an action under "color of law," is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible to provide a meaningful hearing before the deprivation. That does not mean, of course, that the State can take property without providing a meaningful postdeprivation hearing. The prior cases which have excused the prior hearing requirement have rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities.

*Id.* 101 S.Ct. at 1915–16. The Court then proceeded to endorse the analysis employed by then Judge Stevens writing for this court in *Bonner v. Coughlin,* 517 F.2d 1311, 1313 (7th Cir.1975); modified *en banc,* 545 F.2d 565 (1976), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978), which emphasized the availability of a postdeprivation remedy. The Court concluded:

> Application of the principles recited above to this case leads us to conclude the respondent has not alleged a violation of the Due Process Clause of the Fourteenth Amendment. Although he has been deprived of property under color of state law, the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure. There is no contention that the procedures themselves are inadequate nor is there any contention that it was practicable for the State to provide a predeprivation hearing. Moreover, the State of Nebraska has provided respondent with the means by which he can receive redress for the deprivation.

> \*    \*    \*    \*    \*    \*

> Our decision today is fully consistent with our prior cases. To accept respondent's argument that the conduct of the state officials in this case constituted a violation of the Fourteenth Amendment would almost necessarily result in turning every alleged injury which may have been inflicted by a state official acting under "color of law" into a violation of the Fourteenth Amendment cognizable under § 1983. It is hard to perceive any logical stopping place to such a line of reasoning. Presumably, under this rationale any party who is involved in nothing more than an automobile accident with a state official could allege a constitutional violation under § 1983. Such reasoning "would make the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the states." *Paul v. Davis,* 424 U.S. 693, 701,

96 S.Ct. 1155, 1160, 47 L.Ed.2d 405. We do not think that the drafters of the Fourteenth Amendment intended the amendment to play such a role in our society.

*Id.* 101 S.Ct. at 1917.

In my view, the Supreme Court in *Parratt* decided two discrete questions regarding the issue of whether plaintiff had been deprived of property without due process of law. The first question was whether due process required a predeprivation hearing. The court held that no such hearing was required, not *because* of the existence of postdeprivation remedies, but because a predeprivation hearing simply could not be meaningful—indeed, in the case of negligent deprivations, as the Court observed, a predeprivation hearing would be a practical impossibility. Hence, the state's failure to provide Parratt with a hearing before the state officials lost his property did not violate due process. Now it is true that the court said that in prior cases excusing a lack of a predeprivation hearing, the decisions rested in part on the availability of a postdeprivation proceeding, but in those cases a predeprivation hearing would have been meaningful, but the exigencies of the situation justified postponing the hearing until after the initial deprivation. The decisions in those cases—that no violation of due process had occurred—indeed rested on the availability of postdeprivation remedies, because once it was determined a predeprivation hearing was not feasible, that could not end the due process analysis. Nor did that conclusion end the due process analysis in *Parratt.* Rather, the second question which *Parratt* decided was whether the postdeprivation remedy accorded due process of law. The Court examined the remedy provided by state law, and concluded it would provide Parratt a meaningful opportunity to be heard regarding his claim, and that satisfied due process. A contrary conclusion in *Parratt,* of course, would have made § 1983 a font of tort law since predeprivation hearings are conceptually absurd with respect to injuries caused by the negligence of state actors. Any garden variety negligence cause of action against such ac-

tors would necessarily be cognizable under § 1983.

The instant case is not governed by *Parratt*. In this case, before the initial deprivation of Vail's property interest occurred—that is, before Vail was discharged—he could have been provided with a hearing, and the hearing would have provided him with a meaningful opportunity to guard against the risk of a wrongful or erroneous decision. The hearing requirement cannot guarantee an erroneous decision will not occur, but it does serve as a check on that possibility. If Vail had been provided with such a hearing, and still had been discharged, and then attempted to bring a § 1983 action, relief would be denied, and *Parratt* would be applicable. In such a case, the "initial" deprivation of Vail's interest would have been in accordance with due process of law, and Vail could not complain about any "final" deprivation because such a deprivation would not have occurred unless and until he lost a breach of contract action in state court, in which case, assuming the state courts provided him with a full and fair opportunity to litigate his claim, he would have been accorded all the process that was due. In *Hostrop,* we explained the difference between federal and state interests in such a case as follows:

The fact that plaintiff relies upon his employment contract to establish a property interest worthy of protection through the due process clause does not mean that his only remedy is a contract action in state court. A civil rights action based on the deprivation of due process and a contract action to recover damages for a breach are independent remedies. The civil rights action based on deprivation of a property interest established by contract seeks vindication for the arbitrary manner in which the contract was breached. A "garden variety" contract action seeks damages only for the losses caused by the breach once it has occurred in any manner whatsoever. There will be occasions when one action will lie but the other will not, as when the state has grounds to break an employment contract, but does so by violating an employee's due process rights to notice and a hearing.

471 F.2d at 494 n. 15.

Judge Posner's interpretation of *Parratt* accords great, indeed controlling significance to the statements in *Parratt* that in cases where predeprivation hearings were required, the deprivations were authorized by an established state procedure. Here, Judge Posner tells us, the deprivation occurred because of defendants' unauthorized failure to follow established state "procedure" regarding the honoring of contracts. He then questions, in light of *Parratt,* the continuing viability of *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which analyzed under the color of law question.

I believe Judge Posner's analysis of *Parratt* in this regard misconceives the precise issue before the *Parratt* Court. *Parratt* in no way undermines *Monroe v. Pape*—*Parratt* makes plain that even though the negligence of the prison officials was naturally unauthorized, it could not be questioned that their conduct satisfied the under color of law requirement. 101 S.Ct. at 1913. The fact that the conduct was unauthorized was significant only in as much as the conduct was mindless, and hence, not amenable to the salutary protections which a hearing in advance would provide. Moreover, and I think significantly, ministerial actions were at issue in *Parratt*, whereas in this case, a discretionary action is at issue. But in any event, assume that a predeprivation hearing is only required when the deprivation occurs as a result of an established state procedure. In this case, it did. The school board established the procedure for terminating individuals such as Vail, and that procedure was to vote on the matter without providing such individuals with a reason for the decision, nor a meaningful opportunity to be heard. Moreover, the Board authorized the termination; in *Parratt* no responsible official authorized the loss. Judge Posner uses the word "procedure" to mean policy, divines that there is a state policy regarding the honoring of contracts, and hence, the Board's action was not au-

thorized by state policy. In light of that analysis, his discussion of *Monroe v. Pape* is understandable—for the basic issue there was whether a person acting contrary to state law is acting under color of state law. That is not the question in this case, however, nor was it a question in *Parratt.*

Finally, *Parratt,* in analyzing cases in which a predeprivation hearing was required, noted that the Court had recently "recognized that a driver's license is often involved in the livelihood of a person and as such could not be summarily taken without a prior hearing." 101 S.Ct. at 1914. If an interest which is only related to a person's livelihood requires a predeprivation hearing, termination of a person's livelihood should require such a hearing as well.

In conclusion, my research indicates that there has been no deluge of § 1983 cases such as this since our decision in *Hostrop,* nor is that surprising. States have been on notice since *Hostrop* that before discharging a state employee in Vail's position, they must give the employee a meaningful opportunity to be heard. Thus, Judge Posner's argument that this case takes another step down a road which leads to the displacement of state jurisdiction is wrong on several counts. First, *Hostrop* (if not *Roth* itself) took that step a decade ago. Second, if state officials want to avoid the federal courthouse, they need merely provide a meaningful predeprivation hearing. And finally, of course, the state may choose not to employ individuals for short, fixed terms; indeed, such contracts may be rather unusual for reasons having nothing to do with the hearing requirement imposed by the due process clause. Moreover, one wonders that if the result in this case is, as Judge Posner states, "contrary to every principle of federalism and good sense," post at 1456, just why it is that the most he can say with "apodictic certainty" is that the result we reach "is not predestined by existing case law," post at 1456.

In closing, I confess that I myself may question whether there is a federal interest in this case warranting the intervention of the courts of the United States. If I were writing on a clean slate, I would have reservations about embracing a doctrine which led to that conclusion. In view of the current authoritative doctrine, however, I am convinced that Vail states a meritorious § 1983 claim, and therefore I need not embark upon the task of resolving my own doubts about the proposition one way or the other.

POSNER, Circuit Judge, dissenting.

A school board has a squabble with its football coach and fires him, though his (implied) contract has a year to run. This court holds that the board's action violates section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, because: the Fourteenth Amendment forbids the state, of which the school board is an arm, to deprive anyone of life, liberty, or property without due process of law; a contract right is a species of property and was taken away here without a hearing; therefore the state acted unconstitutionally. If this logic is applied unflinchingly, any time a school board or any other local government body breaks a contract without first holding a hearing, the contractor—who need not be an employee, who could be a supplier of paper clips—can get damages in federal court. I am slightly comforted by the realization that the life of the law has not been logic and by the suggestion in Judge Wood's opinion that "other matter[s] of state business" may be treated differently from employment contracts. I would be more comforted if the opinion gave a reason for distinguishing the supply of goods from the supply of personal services, which it does not, and if it omitted the dictum that in the employment area no contract, express or implied, is needed to create a constitutionally protected property right.

But even if the decision in this case can be confined to employment contracts—even if it can be confined to cases where the employee is fired—it goes too far. There is no federal interest in this case, unless the Fourteenth Amendment is thought to invest with federal significance all state action, however unthreatening to the rights

we deem fundamental. Vail was not fired because he exercised his freedom of speech or some other liberty protected by the Constitution, or because of his race (in which event he would have a claim under the equal protection clause of the Fourteenth Amendment), or for any other reason in which the federal courts as tribunals for enforcing the Constitution—viewed as a charter of liberty rather than an invitation to the federal courts to bring the whole business of the states under their wing— have an interest. The only federal question in this case is whether breaches of public employment contracts are constitutional torts litigable in federal court under 42 U.S.C. § 1983. Once that threshold is crossed, all that is left to be discussed—all the court does discuss—is whether the school board broke its contract with Vail under Illinois law. If ever a decision gratuitously displaced state by federal jurisdiction, it is this decision.

I do not submit with as good a grace as my brethren to the tyranny of the syllogism. We can break the chain of reasoning at any of three links. We can hold that the interest created by a contract between a school board and a nonacademic employee for a short fixed term is not "property" within the meaning of the Fourteenth Amendment; that a simple breach of contract does not "deprive" the employee of his right; or that there was no denial of due process of law.

Although the word "property" was broadly understood in the eighteenth century— Madison wrote in 1792 that it "embraces everything to which a man may attach a value and have a right," *Essay on Property,* in 6 Madison, Writings 101 (Hunt ed. 1906) —the due process clause of the Fifth Amendment used the word in a narrower sense and assigned its broader connotations to "life" and "liberty." Madison wrote that a man "has a property of peculiar value in his religious opinions, and in the profession and practice dictated by them. He has a property very dear to him in the safety and liberty of his person. He has an equal property in the free use of his faculties and free choice of the objects on which to em-

ploy them." *Id.* Madison would not have regarded a simple breach of contract as a deprivation of property in the exalted sense in which he was using the term and he could not have thought it a deprivation of property in the narrower lawyer's sense, since in the eighteenth century, as today, contract rights and property rights were distinct. See 2 Blackstone, Commentaries on the Laws of England 442–70 (1766); 3 *id.* at 153–66 (1768). The Constitution distinguishes them explicitly, as one can see by comparing the contracts clause in Article I, section 10, with the due process and just compensation clauses of the Fifth Amendment. And if property means the same thing in the due process and just compensation clauses, a contract right cannot possibly be a property right, because the government does not have to pay just compensation for breaking a contract.

Until the Fourteenth Amendment was enacted there were few decisions interpreting the due process clause of the Fifth Amendment, and none dealt with the status of a mere contract right. There is no basis for thinking that the framers of the Fourteenth Amendment, in applying the due process clause of the Fifth Amendment verbatim to state action, wanted to give "property" a brand new meaning. Of course many Fourteenth Amendment due process cases have involved "liberty of contract," but that is a different animal from specific contract rights. If the State of Illinois forbade Mr. Vail to work as a football coach it would be interfering with his liberty of contract, cf. *Allgeyer v. Louisiana,* 165 U.S. 578, 591, 17 S.Ct. 427, 432, 41 L.Ed. 832 (1897)—that is, with property in the Madisonian sense—but that is not what it did, which is why cases like *Allgeyer* and like *Hampton v. Mow Sun Wong,* 426 U.S. 88, 102, 96 S.Ct. 1895, 1904, 48 L.Ed.2d 495 (1976), are irrelevant. Not even in the palmiest days of liberty of contract was it thought that a state infringed that liberty by breaking a contract with one of its employees or suppliers. See *Hartigan v. Board of Regents,* 49 W.Va. 14, 38 S.E. 698 (1901). The spirit of those times is well captured by

a statement made by the Supreme Court of Tennessee in reference to the most famous public school teacher in American history: "in dealing with its own employees engaged upon its own work, the state is not hampered by the limitations of . . . the Fourteenth Amendment to the Constitution of the United States." *Scopes v. State,* 154 Tenn. 105, 112, 289 S.W. 363, 365 (1927).

*Perry v. Sindermann,* 408 U.S. 593, 599, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972), is often thought to have raised a contract right to the level of a constitutional property right. Its companion case, *Board of Regents v. Roth,* 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709–10, 33 L.Ed.2d 548 (1972), held that if a state college teacher had no right under state law to continued employment he had no property right under the due process clause. But Sindermann alleged that he had an implicit right to tenure under state law, and the Court remanded the case for a trial of that allegation.

No doubt the Court believed that if Sindermann had tenure under state law he could not be discharged without due process of law, though this was assumed rather than argued. But the Court did not thereby equate contract rights with property rights having their source in contracts. Sindermann "alleged that [his interest in continued employment at Odessa Junior College], though not secured by a formal contractual *tenure* provision, was secured by a no less binding understanding fostered by the college administration. In particular, [he] alleged that the college had a de facto *tenure* program, and that he had *tenure* under that program." 408 U.S. at 599–600, 92 S.Ct. at 2698–2699 (emphasis added). The important thing was not that a contract was alleged to have been broken but that tenure—arguably a form of property, a form having its source, as much property has its source, in contract—was alleged to have been destroyed.

A contract that gives a teacher the right to be employed till he retires is special, for unless he is old or rich the present value of his tenure right is probably his biggest as-

set. The Supreme Court, in dealing with recipients of welfare benefits, had held before *Sindermann* that statutory entitlements of indefinite duration have enough attributes of conventional property to be protected by the due process clause. See, e.g., *Goldberg v. Kelly,* 397 U.S. 254, 261–62, 90 S.Ct. 1011, 1016–17, 25 L.Ed.2d 287 (1970). *Sindermann* and the welfare cases extend to individuals who lack substantial assets of a conventional sort the protection of the due process clause for the unconventional assets they have.

The present case involves a two-year implied contract that when terminated had only one year to run. It is true that the difference between term and tenure contracts is one of degree and that if a teacher had only one year to go to retirement his stake in his tenure contract would be no greater than Vail's. But this is only to say that some contract rights are worth more than some property rights; it does not eliminate the distinction between tenure as property and a mere contract right. It is also true that *Hostrop v. Board of Junior College Dist. No. 515,* 471 F.2d 488, 494 (7th Cir.1972), extended *Sindermann* to term employment contracts. But it did so uncritically, without discussion of the distinction I have just noted; and since, like *Roth* and *Sindermann,* it involved a teacher rather than an athletic coach, it is distinguishable from the present case by reference to a long history of judicial solicitude for the interests of teachers—especially college teachers, the plaintiffs in *Roth, Sindermann,* and *Hostrop.*

Daniel Webster argued to the Supreme Court in the *Dartmouth College* case that "professors have freeholds in their offices; subject only to be removed, by the trustees . . . for good cause . . . . No description of private property has been regarded as more sacred than college livings. They are the estates and freehold of a most deserving class of men . . . ." *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 583–84, 4 L.Ed. 629 (1819). See also *Hartigan v. Board of Regents, supra,* 49 W.Va. at 30–60, 38 S.E. at 709–18 (dissent-

ing opinion). The idea that teachers have a special claim to judicial protection now goes by the name of academic freedom, "a concept fashioned from other constitutional rights, including the First Amendment and due process rights of faculty to avoid censure for the views they teach and espouse." *Gray v. Board of Higher Educ., City of N.Y.*, 692 F.2d 901, 909 (2d Cir.1982); see also cases cited at *id.*, n. 14; *Martin v. Helstad*, 699 F.2d 387, 391 (7th Cir.1983); *id.* at 392–99 (concurring opinion). Most cases (again including *Roth, Sindermann,* and *Hostrop*) in which teachers have mounted constitutional challenges to their dismissal have involved alleged deprivations of freedom of speech—one of the liberties protected by the due process clause—as well as of a property right in continued employment. Although the Supreme Court in *Roth* and *Sindermann,* and a panel of this circuit in *Hostrop,* treated these as distinct rights, this may have been—though I admit I am speculating—because protection against arbitrary dismissal was thought necessary to prevent infringements of freedom of academic speech that would be too difficult to prove. The dismissal of a football coach does not endanger academic freedom.

The First Circuit's recent decision in *Casey v. DePetrillo*, 697 F.2d 22 (1st Cir.1983) (per curiam), which upheld the dismissal of a public school employees' section 1983 suit against local school officials, shows the difference between this case and *Hostrop.* The suit alleged that "the defendants injured [the plaintiffs] by breaching the plaintiffs' employment contracts," *id.* at 23, and was thus, "at bottom, a simple action for breach of contract for which the state provides a complete and adequate remedy" and which therefore "failed to state a claim for relief under federal law," *id.* There is no indication that the plaintiffs were academic employees with tenure—but Mr. Vail is not an academic employee with tenure either.

But if *Hostrop* is indistinguishable from the present case, then let us overrule *Hostrop,* a decision of this court, not of the Supreme Court. The Supreme Court has never equated tenure with nontenure contracts; and we are not obliged to read Supreme Court decisions broadly in order to reach foolish results. I plead guilty, though, to Judge Eschbach's charge that I am "superimposing a unifying doctrinal thread onto the cases which would explain their outcomes in a principled fashion." I had understood this to be my job.

Suppose all this is wrong, however, and Vail's contract really did give him a Fourteenth Amendment property right; still, he would have a Fourteenth Amendment claim only if the breach of contract "deprived" him of that right. Whether it did depends on the precise content of the right. "Property interests ... are created *and their dimensions are defined* by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709 (emphasis added). So we must determine exactly what right Vail's contract gave him under the laws of Illinois.

An employee complaining of a breach of an employment contract under Illinois law has a right to damages for the breach, but not a right to specific performance of the contract, *Zannis v. Lakeshore Radiologists, Ltd.*, 73 Ill.App.3d 901, 29 Ill.Dec. 569, 392 N.E.2d 126 (1979), to reinstatement in other words; and Judge Eschbach points out that this principle was applied to nontenured teachers in *Bessler v. Board of Educ.*, 69 Ill.2d 191, 13 Ill.Dec. 23, 370 N.E.2d 1050 (1977). As Holmes, writing of contract rights in general, said, "The only universal consequence of a legally binding promise is, that the law makes the promisor pay damages if the promised event does not come to pass. In every case it leaves him free from interference until the time for fulfillment has gone by, and therefore free to break his contract if he chooses." The Common Law 301 (1881). Vail never had a right to performance of the contract—a right to force the school board to keep him. He had only a right to performance *or* damages for nonperformance. The state would have deprived Vail of this disjunctive right only if it had refused to pay him damages for

breaking its contract, and it has not refused; if he can prove that the contract was broken, the state through its court system will give him damages. See Ill.Rev.Stat. 1981, ch. 122, § 10–2; *Jewell v. Board of Educ.,* 19 Ill.App.3d 1091, 312 N.E.2d 659 (1974); *Piper v. Board of Trustees,* 99 Ill. App.3d 752, 55 Ill.Dec. 287, 426 N.E.2d 262 (1981); cf. *Powell v. Jones,* 56 Ill.2d 70, 77–78, 305 N.E.2d 166, 169–70 (1973).

I am not arguing, as I may seem to be, that Vail failed to exhaust his remedies under state law. I accept that exhaustion normally is not required in section 1983 cases, and is not required here. A requirement of exhaustion would mean that Vail had to sue first in state court but if he lost he could then sue in federal court, like a state prisoner seeking federal habeas corpus. This would assume, however, that the state had deprived Vail of a constitutionally protected interest such as property, and that the only question was whether he could complain of that deprivation in federal court before seeing what relief he could get in state court. But since the right Vail was allegedly deprived of is just a right to a particular remedy—damages—he cannot complain that he has been deprived of that right unless the state fails to provide him with the remedy, and if there is no deprivation, there is no cause of action under section 1983. As there is no suggestion that the State of Illinois does not provide remedies in its courts for breaches of contracts with public school employees, I do not see how we can conclude that Vail has been deprived of any right given him by the state, or even that he has alleged such a deprivation.

Concurring in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), Justice Stewart—the author of *Roth* and *Sindermann*—asked hypothetically whether "damages to a person's automobile resulting from a collision with a vehicle negligently operated by a state official" would be "a deprivation of property within the meaning of the Fourteenth Amendment," and answered that it would not be. 451 U.S. at 544–45, 101 S.Ct. at 1917. He could not have meant that the automobile was not

property; he must have meant that negligent damage to it would not be a deprivation of property. Justice Powell's concurring opinion in the same case explains why: "under state law no remedy other than tort law protects property from interferences caused by the negligence of others.... [T]herefore, ... the enjoyment of property free of negligent interference is not sufficiently 'guaranteed' by state law to justify a due process claim based on official negligence." *Id.* at 549 n. 7, 101 S.Ct. at 1920 n. 7. Just as the State of Illinois has not promised to protect Vail's property from negligent harm, but only to give him a damages remedy for the harm, it did not promise that the school board would employ him for the full term of his contract but only that he would have a damages remedy for breach of contract if it did not. There is no suggestion that the state means to renege on that promise.

This analysis reinforces my previous point that a contract right, as such, is not property. We infer the existence of a property right from the remedies the law gives to protect it. A right protected by an injunction, by specific performance, or by criminal penalties is a property right. But if the only remedy the law provides for some wrong is damages, we speak of a liability rule rather than of a property right. See Calabresi & Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral,* 85 Harv.L.Rev. 1089, 1092, 1125 (1972). You have a property right against (most) deliberate takings of your car but not against its being demolished in an accidental collision with another car, even if the driver of that car is negligent, and you are not; your only right is to damages. No more has the employee under an employment contract the right to ask a court of equity or the criminal justice authorities to prevent a breach of the contract. His only right, like that of a victim of negligence, is to have the employer held liable for damages, and it is not a property right.

But even if Vail had a property right and the state deprived him of it, his claim fails

because there was no denial of due process. Due process does not always require that you get a hearing before rather than after your property is taken. *Sutton v. City of Milwaukee,* 672 F.2d 644 (7th Cir.1982). To hold that the deprivation in this case required a hearing in advance is to require the states in the name of the Constitution to set up special tribunals to adjudicate all contract disputes (at the very least all employment-contract disputes) that might result in a state agency's terminating a contract. Vail could have sued the school board in state court for breach of contract, as I have already pointed out; and if he had done so he would have received a hearing that satisfied the requirements of due process.

What indeed would be the purpose of a "predeprivation" hearing in this case? Since state law allows the school board to break its contracts with probationary employees such as Vail for any reason or no reason, provided only that it is willing to pay the employee's damages, the employee has little to gain from such a hearing. It is not as if Vail had been fired for cause, and there was a question whether he really had given cause; then a hearing might help. The only hearing that could help him would be a hearing for the purpose of adjudicating that there was a breach of contract and computing his damages if a breach was found. He can get that kind of hearing in state court by suing for breach of contract; he cannot get it from the school board.

In deciding what process is due, and specifically whether a predeprivation hearing is required or whether a postdeprivation hearing is good enough, the courts consider as one factor the gravity of the deprivation complained of. See, e.g., *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Sutton v. City of Milwaukee, supra,* 672 F.2d at 645–46. But it borders on the melodramatic to describe what happened to Vail, in Judge Eschbach's words, as "termination of a person's livelihood ...." Vail was fired in breach of a contract. The wrong done to him was a type of wrong that traditionally has not been thought so grievous that it cannot be

adequately remedied by a suit for damages. That is all he is suing for in federal court. As long as he can seek damages in a suit in a state court that is not alleged to harbor prejudices against this class of litigants or to follow unfair or inadequate procedures, I cannot see that the state has treated him in the arbitrary fashion that one associates with denying a person due process of law.

In suggesting that common law remedies may, in some cases of alleged deprivation of property rights, provide all the process that is due, I am not making a new argument. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), held that state prison officers had not denied a prisoner due process by negligently losing his hobby kit. He had an adequate common law remedy, which was all the process that was due him since "the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the state to follow established state procedure." *Id.* at 543, 101 S.Ct. at 1917. In this case too, any deprivation of property was due to the defendants' "unauthorized failure ... to follow established state procedures" regarding the honoring of contracts, and the plaintiff had an adequate common law remedy, as is shown by the fact that the district court awarded Vail just his common law contract damages. In contrast, in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), the common law remedy was inadequate. 102 S.Ct. at 1158.

I admit that the facts of *Parratt* are very different from those of this case; and maybe Judge Wood is right in thinking that *Logan* has clipped *Parratt's* wings. There is undoubted tension between *Parratt* and the case that made 42 U.S.C. § 1983 what it is today, *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *Monroe* held that police brutality was actionable under section 1983 regardless of what tort remedies the victim might have against the police under state law. ("The complaint alleges that 13 Chicago police officers broke into petitioners' home in the early morning,

routed them from bed, made them stand naked in the living room, and ransacked every room, emptying drawers and ripping mattress covers. It further alleges that Mr. Monroe was then taken to the police station and detained on 'open charges' for 10 hours, while he was interrogated about a two-day-old murder, that he was not taken before a magistrate, though one was accessible, that he was not permitted to call his family or attorney, that he was subsequently released without criminal charges being preferred against him. It is alleged that the officers had no search warrant and no arrest warrant ...." *Id.* at 169, 81 S.Ct. at 474.) Though it is too soon to know where the line will be drawn between *Parratt* and *Monroe,* or even whether both decisions will endure, it is at least possible that simple breaches of contract (assuming, as I do not, that they automatically cause "deprivations" of "property") will be held to fall on the *Parratt* side. When *Monroe* was decided, state tort remedies against police officers were considered worthless. See Foote, *Tort Remedies for Police Violations of Individual Rights,* 39 Minn.L.Rev. 493 (1955). That was a reason for ignoring them in deciding what process was due. My brethren do not question the effectiveness of state contract remedies.

Another basis for distinguishing *Monroe* and *Parratt* is suggested in *Duncan v. Poythress,* 657 F.2d 691, 704–05 (5th Cir.1981), cert. dismissed as improvidently granted, —— U.S. ——, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982), and in Judge Wood's decision for a panel of this circuit in *Wolf-Lillie v. Sonquist,* 699 F.2d 864 (7th Cir.1983): *Parratt* applies where the only violation of the due process clause of the Fourteenth Amendment is a denial of due process in its original sense of proper procedure, *Monroe* where the violation involves a breach of one of the guarantees of the Bill of Rights (in *Monroe* itself, the Fourth Amendment, see 365 U.S. at 171, 81 S.Ct. at 475) that have been applied to the states through the due process clause of the Fourteenth Amendment. 699 F.2d at 871–72. The Bill of Rights protects the interests of unpopular or vulnerable groups and it is natural to be concerned about the adequacy of their legal remedies. Football coaches do not comprise such a group and Vail makes no claim under the Bill of Rights.

No doubt *Parratt* can be read even more narrowly than I have done—maybe so narrowly as not to affect this case at all. There is an argument for reading Supreme Court decisions narrowly: it is a busy court and cannot foresee and be taken to approve every potential application of its opinions if they are read broadly. But why my brethren choose to read a recent Supreme Court decision (*Parratt*) narrowly, and on older one (*Sindermann*) broadly, eludes me. If *Sindermann* were construed as narrowly as Judge Wood's and Judge Eschbach's opinions in this case construe *Parratt,* then *Sindermann* clearly would not be controlling either.

If my brethren think *Parratt* a sport, they should say so, rather than try to distinguish it on factitious grounds, such as that it applies only to negligent deprivations of property, as argued by Judge Eschbach. That reading of *Parratt* is inconsistent with several recent decisions of this court, including Judge Wood's decision of a few weeks ago in *Wolf-Lillie.* That was not a case of negligent deprivation. Nor was *Ellis v. Hamilton,* 669 F.2d 510 (7th Cir.1982), which *Wolf-Lillie* cites for the proposition that *Parratt* "requires federal courts to consider the adequacy and availability of remedies under state law before concluding that a deprivation of life, liberty, or property violates due process of law." 699 F.2d at 871. *Wolf-Lillie* involved "a pervasive pattern of executing invalid writs of restitution" by Sheriff Sonquist's deputies with his knowledge. *Id.* at 870. Judge Wood did not call this conduct "negligent." He could not have; the conduct was intentional tortfeasing.

Nor can *Parratt* be easily distinguished on the ground that, in Judge Eschbach's words, the conduct of the defendants here was not merely "ministerial" or "mindless." Any deprivation of Vail's right resulted from the isolated action of a single school board; the state was not implicated. That

is another possible difference between this case and *Logan v. Zimmerman Brush Co., supra,* where in distinguishing *Parratt* the Supreme Court said that "Logan is challenging not the Commission's error [the Illinois Fair Employment Practices Commission, corresponding to the school board in this case], but the 'established state procedure' that destroys his entitlement without according him proper procedural safeguards." 102 S.Ct. at 1158. True, the members of the school board in this case are more responsible officials than the prison employees who lost the hobby kit in *Parratt.* But in *Flower Cab Co. v. Petitte,* 685 F.2d 192 (7th Cir.1982), this court applied the principle of *Parratt* to a property deprivation by Chicago's Commissioner of Consumer Services. If Judge Eschbach is entitled to ignore *Petitte,* not to mention *Wolf-Lillie* and *Ellis,* I do not see why I should feel bound by *Hostrop.*

Furthermore, while some breaches of contract are intentional and some others are negligent, nothing in the law of contracts requires that a breach be either intentional or negligent to be actionable. A garden-variety breach of contract is even less culpable than the garden-variety tort involved in *Parratt.* Breach of contract is a strict-liability concept. Outside the limited shelter given by impossibility and related doctrines, a party who breaks his contract is liable for the consequences of the breach even if it was due to events completely beyond his control—even if it was involuntary, and so in a sense "mindless." If *Parratt* confines the victim of negligent conduct to his remedies (provided they are adequate) under state law, it should likewise confine the victim of unavoidable conduct.

But forget *Parratt,* and my basic point remains: in a case of this sort, where one is about as far away as one can get from the gross police misconduct alleged in *Monroe v. Pape,* the requirements of due process are satisfied by the remedies that the state provides in its courts for breaches of contract by its school boards. And this is but one of my grounds for arguing that Vail has no right to relief under 42 U.S.C. § 1983; the others, it will be recalled, are that there is no property right at stake in

this case and that in any event there has been no *deprivation* of such a right. I do not argue that any of these grounds possesses apodictic certainty but at least they show that the result in this case is not predestined by existing case law. The Supreme Court has not decided the question in this case. We do that Court a disservice to apply its 1972 decisions in *Roth* and *Sindermann* to the very different facts of this case, ignoring all that has happened in the law relevant to section 1983 since then, reaching a result that is contrary to every principle of federalism and good sense, and putting the blame on the Court. I have tried very hard but without success to think of a reason why a football coach should be allowed to litigate his contract claim against a school board in a federal district court. I get no help in this endeavor from being told by Judge Eschbach that this case is about the "termination of a person's livelihood," or by Judge Wood that football coaches "are generally not second class members of a balanced school program." We are witnessing the trivialization of the Constitution. I regret almost more than I can say that my brethren's method of interpreting precedent has led them to take another step on the road whose terminus is the displacement of the whole of state law into the federal courts.