**UPADHYA, Plaintiff,**

v.

**LANGENBERG, et al., Defendants.**

No. 87 C 0086.

United States District Court,
N.D. Illinois, E.D.

Aug. 31, 1987.

---

Martin J. Oberman, Edward H. Salomon, Chicago, Ill., for plaintiff.

Carla J. Rozycki, James T. Otis, Donald J. McNeil, Keck, Mahin & Cate, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

Kamleshwar Upadhya was born in India in 1949. After attending an English school in Japala, India he went to Banaras University in India where he earned a Bachelor of Engineering Degree. Then he went to the University of Strathclyde in Glasgow, Scotland from which he obtained a Ph.D. in Metallurgy in 1977. In 1978 he returned to Banaras University in India as a research officer. From 1979 to 1981 he was at the Newcastle Polytechnic Institute and in 1981 he spent one year in the field of metallurgy in Australia with an emphasis in the specialized area of liquification. He came to the United States in January 1982 to attend a conference of the American Institute of Mining, Metallurgical and Petroleum Engineers at Dallas, Texas where he received an award as the co-author of a paper on metallurgy. While there he met a number of people who were interested in hiring him. He then went to work in research at Penn State during the summer of 1982, following which he went to the University of Missouri at Rolla as a research assistant professor. In the meantime he worked in research at Penn State for one month in the summer of 1982 before going to Rolla. From Missouri he went the next year to a position at the University of Minnesota supervising the research of graduate students. He was a research associate on a grant fellowship from the school. During the several years in his career in America he published a number of learned treatises on areas of research in metallurgy, and he received several awards in the field.

It is important to note that it was Upadhya's studies and research that brought him to the University of Minnesota where he was employed as a research associate. This was a special position resulting from his having received a fellowship grant from the university.

In March of 1984, while still on the Minnesota fellowship, Upadhya read an advertisement that appeared in the *Journal of Metals*, the top publication in the field. This ad indicated that currently the University of Illinois was soliciting applications for a "tenure track" position in its Department of Civil Engineering, Mechanics and Metallurgy (CEMM) located in Chicago. The ad specified that the professorship would be in the "general area" of "metallurgy", that the initial appointment would be that of an associate professor, and that it would be for a period of four years. According to the ad, the position also required that the candidate perform teaching duties, in addition to "developing for the University funded research projects."

Upadhya responded to the ad. He telephoned the University and spoke with a Dr. Michael McNallen, as associate professor and the Chairman of CEMM's Curriculum Committee. Upadhya previously had met Dr. McNallen at one of the annual national education conferences of academics in the mining and metals science field. McNallen informally explained to Upadhya what the position entailed and encouraged him to apply for it and to forward to him, Dr. McNallen, his resume. Upadhya promptly did this. His resume showed that he had received his Ph.D. in Metallurgy and it included a list of his prior teaching and research positions. Although Upadhya had taught briefly in several places, he had not yet taught as a tenured or full-time professor. His resume concluded with a listing of his publications, his research proposals, and his references.

Near the beginning of June of 1984, McNallen telephoned Upadhya seeking to arrange for him an on campus interview to take place on June 12, 1984. Upadhya agreed. He arrived in Chicago the evening before the scheduled interview. He was provided hotel accommodations and was taken to dinner by Dr. McNallen and several of his colleagues. The next morning he was escorted around the University's campus and introduced to several other members of the CEMM department, and at the invitation of the department he conducted a mock seminar on some topic in his field. In the course of his discussions with members of the faculty, Upadhya became aware that because of his extensive educational background he would be eligible to begin as either an associate professor or a lower ranking assistant professor. The faculty, and in particular McNallen, Chien–Heng Wu, the Department Head of CEMM, and a tenured professor named Stephan Danyluk, took Upadhya aside and explained to him the differences and respective advantages of the two positions. Wu, McNallen, and Danyluk all told Upadhya that if he elected to become an associate professor he would be given a higher starting salary, but would receive only a two year track during which to gather sufficient research grants and establish a sufficiently favorable teaching record necessary to obtain a tenured position. Conversely, as an assistant professor, Upadhya would have to begin at a lower salary, but he would be given five years to pursue his research projects before being considered for a tenured position. Wu, McNallen, and Danyluk advised Upadhya as an experimentalist he would find it safer to take the assistant professorship in order to have more time in which to build a favorable record.

Upadhya returned to Minnesota. Then in July of 1984, he received a phone call from Professor Wu offering him the position of assistant professor on a 5–year tenure track at the salary of $35,000 a year. Based upon the advice he had received in his earlier conversations with Wu and the other faculty members Upadhya elected to take the lower ranking assistant professorship, believing that he would have a better chance of obtaining tenure if he had the five years in which to build his record. A few days later he telephoned Professor Wu and verbally accepted the University's offer. During their phone conversation Wu indicated to him that the school's offer was subject to a final approval of the University's Board of Trustees and to the completion of the usual administrative formalities that accompanied the appointment of a new professor. Wu informed him that once these procedural formalities were complet-

ed a letter of confirmation of their agreement would be mailed to him.

Due to a mutual convenience in timing, Upadhya arranged with Wu to pick up the confirmation letter a few days later at a time when he was scheduled to be in Chicago for some other purpose. So, on July 30, 1984, Upadhya being in Chicago went to Wu's office and obtained the confirmation letter. The letter confirmed that Upadhya had been offered a "tenure-track assistant professorship" with a tenure code of "A2". The letter further explained that A2 meant that "a recommendation for promotion or termination must be submitted by the department no later than the beginning of his fifth year service on campus."

Based upon his understandings from his prior discussions with Wu and McNallen, Upadhya considered that the letter of confirmation to be in conformity with his belief that he had accepted a five year tenure track professorship. The confirmation letter conformed to his understanding of the statements made to him to the effect that he would be given the entire allotted five year probationary period before any determination would be made as to whether or not he would be granted tenure. Upadhya concluded his day in Chicago by discussing with McNallen the structure of the course he would be teaching come September.

As the fall semester hurriedly approached, Upadhya rushed to make preparations to facilitate his move to Chicago. He notified the University of Minnesota that he would be leaving. He made arrangements to move his belongings to Chicago, and made plans to have his wife join him here. In addition, he arranged to turn down two pending offers of teaching positions, one in Australia and one at the Massachusetts Institute of Technology, having decided that the University of Illinois appointment would give him greater long term benefits.

Upadhya arrived on campus in Chicago on or about the 4th of September. Right away he began setting up his office and preparing his course curriculums. On September 7th, while sorting through his mail he found a letter enclosing a standardized "Notification of Appointment" form. This "Notification of Appointment" stated that Upadhya had been assigned "Tenure Code 2", and it requested Upadhya to indicate in writing, with his signature at a place provided for it, that he accepted the appointment. Believing the standardized form contained no deviations from the agreement letter of July 30, 1987, Upadhya signed the form. The evidence in the case discloses that it was the standard practice of the University to enclose with this "Confirmation of Appointment" a second document entitled "Certain Terms of Employment" which outlined in detail the terms and conditions of employment by the University. In his deposition and at the trial Upadhya denied that he received this document or that its contents were ever brought to his attention by anyone at the University. In May of 1986 he received his formal notice of termination.

On September 11, 1984, the copy of the Notice of Appointment form which Upadhya had signed was received by the Secretary of the Board of Trustees and copies of it were made and routinely circulated among appropriate school officials. Included in the language of the Notice of Appointment was a provision that stated, "[T]his appointment is made subject to all applicable laws and to the University of Illinois Statutes." Also included was an explanation of the "A2" numerical code assigned to Upadhya, which meant that Upadhya's appointment was an "indefinite term appointment."

Later in September of 1984, Upadhya began his teaching duties and on October 1, 1984, he received his first payroll check. Later in October presumably following a final review of his appointment and the receipt by the Board of Trustees of the required administrative forms, the Board approved Professor Upadhya's appointment at meeting held by the Board of Trustees on October 18, 1984, and recorded by its secretary.

The next correspondence about the job which Upadhya received from the University did not come to him until 21 months later, on May 28, 1986. This was when he

was presented by the Vice–Chancellor of Academic Affairs with a from notice from the University entitled "Recommendation for Non–Retention." The reason given for the recommendation was a charge of "insufficient teaching." This recommendation subsequently was approved and Upadhya was issued a final one year contract terminable August 31, 1987.

### PROPERTY INTEREST

The Fourteenth Amendment to the United States Constitution provides in pertinent part that "No State shall ... deprive any person of ... property, without due process of law ..."

■ The Fourteenth Amendment thus provides protection to every person against state action that adversely affects a property right even though that right may evolve from some security interest that is acquired through expected benefits to be received. *Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). Once a protectible property interest has attained but has been threatened by state action it becomes the court's duty, if the matter is before it, to insist upon the invocation of the safeguards of procedural due process, as the same is contemplated by the Fourteenth Amendment. Precisely when a protectible property interest has attained cannot be reduced to an objective criteria nor rounded into a technically formulated concept. *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). But as the Supreme Court has stated, "[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicity understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry* at 601, 92 S.Ct. at 2699.

■ In the field of employer-employee relations many various employment situations are to be described by the "mutually explicit understanding" concept expressed in *Perry v. Sindermann*. These situations can arise when there is (i) an express contract, or (ii) a contract implied in fact, or (iii) when there are circumstances giving rise to contract growing out of a reasonable right of the employee to rely upon the conduct of his employer. Plaintiff proposes in the alternative that his situation affords him compelling arguments in either one or the other of each of these three categories.

First, plaintiff insists that the July 30, 1984, letter authored by Professor Wu created an express contract for a term of five years on the tenure track. Second, plaintiff contends that the July 30, 1984, letter combined with the discussions and representations of the particular faculty members in this case created an implied contract for five years. Finally, plaintiff asserts that, again because of the representations and conduct of these particular faculty members, and because of his own action reasonably to be expected in response to those representations, including his foregoing other employment and relocating his residence, there evolved what Upadhya had a legitimate right to assume was the promise of a five year tenure track employment.

■ A review of the trial proceeding in this case makes it apparent that the actions and representations made by both Upadhya and the University officials created a binding implied contract subject to the protections of due process. The recitation of them in plaintiff's proposed findings of fact is exceptionally compelling.

*Vail v. Board of Education*, 706 F.2d 1435 (7th Cir.1983), establishes the law on this situation as it is at this time in this Circuit. That case controls the position to be taken here in this case. It is that the Illinois law of implied contracts gives rise to the creation under the facts here, where the employer is itself the State of Illinois, of a property interested protected under by the Fourteenth Amendment, and called into play by the use of 42 U.S.C. § 1983. The *Vail* court stated that, "[u]nder Illinois law, an implied contract is proven by circumstances showing that the parties intended to contract or by facts and circumstances from which a meeting of the minds can be inferred." *Vail* at 1438. A review

of the evidence here supports the observation that an implied contract attained between the parties, the terms of which closely trace the interpretation given it by the plaintiff in his recitation of the facts ... the terms of which are not in severe difference when recited by the defendants. The evidence shows that there was an ongoing and uninterrupted series of actions and assurances, both formal and informal, exchanged between the parties that left Upadhya with a legitimate expectation of continued employment through the full of a five year tenure track term. From the moment he responded to the magazine advertisement the University actively pursued him, very much wanting him to become a part of its CEMM faculty. Upadhya was flown by the defendant to Chicago; he was entertained; he was given assurances in his interviews; he was attended in his conducting of a demonstration seminar. While in Chicago arrangements were made for him to talk with the head of the department, the head of its Curriculum Committee, with members of the advisory committee, and with other professors in the department. Professors Wu, McNallen and Danyluck advised and convinced him to pursue the longer term assistant professorship because such position would give him the full of five years to establish an impressive portfolio and to enhance his chances for tenure. He was invited by all that happened to him to place his reliance upon the words of these soon to be fellow professors.

Upadhya's belief that he had the opportunity of obtaining a five year contract was then reaffirmed by Professor Wu's telephone offer and subsequent letter of June 30, 1984, confirming Upadhya's appointment. At no time during their phone conversation was he instructed that his term of employment would be governed by a University Statute that would require him to be reappointed each year, or that he could be discontinued at anytime without being given a reason. Moreover, it is reasonable to interpret Wu's letter of July 30, 1984, when read in its entirety, as constituting a binding written agreement upon its being signed and returned to him. This certainly created the foundation for a legitimate implied contract, if not an agreement expressed in fact. This letter of July 30, 1984, contained the terms of Upadhya's salary, the details of his tenure track, his expected duties, and most importantly, the request that he formally respond in writing to the University's "offer" by signing and returning an acceptance copy in order that the school "resolve the other *formalities.*" (Emphasis added.) This complies with the common law requirements of agreement, offer and acceptance and exchange of consideration. As plaintiff notes, the letter of July 30, 1984, was the same letter in which Wu previously had told Upadhya that he would outline in "black and white" all of the terms and conditions of Upadhya's employment.

Further, as plaintiff again notes, the evidence at trial was uncontested that no one actually ever told Upadhya when the Board of Trustee's approval would occur. Actually it did not occur until October 18, 1984. It is also uncontested evidence supported by the testimony of Chancellor Langenberg that Wu, the department head of CEMM, had general authority to write the letter of confirmation and to make the offer.

The court is in agreement with the plaintiff's conclusion that as of July 30, 1984, Upadhya and CEMM conducted themselves as though a binding employment contract had been entered into. There is acquiescence in this fact by the evidence that both Wu and McNallen fully anticipated and expected Upadhya to begin working and engaging in his teaching duties when school opened in September. Moreover, Upadhya prior to arriving on campus in September discussed with McNallen the course he was to be prepared to teach that fall and that he should forward the course outline to McNallen on August 1, 1984. Indeed, it was not until over six weeks after Upadhya began his work as an assistant professor that his appointment reached the desk of and presumably received final approval by the Board of the University. But this was a formality after the fact which did not change the time nor the terms of his appointment.

"A term of employment set by contract has been recognized as a property interest which the state cannot extinguish without conforming to the dictates of procedural due process." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), *Board of Regents v. Roth*, 408 U.S. at 576–577, 92 S.Ct. at 2708–09. The existence of such a contractually established property interest obligates the Board, before depriving Upadhya of it, "to grant him a hearing [procedure in which he] can be informed of the reasons for his non-retention and [be able to] challenge their sufficiency." *Hostrap v. Board of Junior College District No. 515, et al.*, 471 F.2d 488, 494 (7th Cir.1972). Astonishingly, the first time Upadhya was made aware that the University considered his appointment to entail an employment at will, if not a year to year appointment, was on June 16, 1986, two years after his initial hiring and substantially subsequent to his receipt of the notice of termination.

The fact of the matter is that, according to the evidence, the University had at that time no established policy for dealing with the situation involving the formal hiring of Professor Upadhya. The validity of the University Statutes are not in question. The evidence is that these statutes or regulations were never formally brought to Upadhya's attention at the time he was hired. The record establishes that Upadhya received copies of them *after* he accepted Wu's unconditional written offer and after he had signed and returned it. Consequently, this court concludes in agreement with the court in *Vail*, that Upadhya acted reasonably in relying on assurances and conduct of University officials that he had a tenure track position. This was sufficient "to create a property interest despite state law and university regulations ..." *Vail* at 1440, quoting *Soni v. Board of Trustees of the University of Tennessee*, 513 F.2d 347 (6th Cir.1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976). The evidence at trial convinces this court that the formal assurances given by the University adequtely gave rise to a legitimate and reasonable expectations of a protectible property interest. · *Vail* at 1440.

*See also McElearney v. University of Illinois Chicago Circle*, 612 F.2d 285 (7th Cir.1979) (addressing the question of whether informal assurance can create a property interest). Accordingly, plaintiff acquired through the implied contract entered into with him by the defendants a property right protected under the Due Process Clause and 42 U.S.C. § 1983.

## DUE PROCESS

The question is just what does "due process" entail in a situation involving the sudden, intra-semester firing of a state college professor hired on a 4–5 year tenure track (though the formalities of his continuation on that track are provided for with an annual appointment for the subsequent year and a prerequisite to tenure is handled by a formal performance evaluation done one year prior to the end of the tenure track). It may be that it calls for as much as was required by the Supreme Court for the discontinuation of benefits to a welfare recipient. There the Court stated that the requirement is (1) a *pre-termination evidentiary* hearing (acknowledging that where harm to the general public is so threatened that summary and immediate removal of the presumed cause is mandated by common sense—as with the seizure of food claimed to be unfit for human consumption); (2) a hearing that takes the form of a judicial or quasi-judicial trial, though a complete record and a comprehensive opinion of the decision maker would be out of the question; (3) with notice given sufficiently prior to the hearing to permit the recipient to prepare for it and if necessary to obtain counsel or other advice; (4) the right of confrontation sufficiently fundamental to fairness in answering to charges made; and (5) the hearing to be before an impartial and fair hearing officer or body— i.e., impartial to the extent that he not be himself the accuser. *See generally, Goldberg v. Kelly*, 397 U.S. 254, 263–271, 90 S.Ct. 1011, 1018–22, 25 L.Ed.2d 287 (1969), and cases cited therein. *See in particular: Willner v. Committee on Character & Fitness*, 373 U.S. 96, 103–104, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224 (1963).

*See also, Parratt v. Taylor,* 451 U.S. 527 at 537–543, 101 S.Ct. 1908 at 1913–17, 68 L.Ed.2d 420. The Supreme Court has been consistent in maintaining that where "deprivations of property [have been] authorized by an established state procedure," due process has required pre-deprivation notice and hearing "in order to serve as a check on the possibility that a wrongful deprivation would occur …" The fundamental requirement of due process is the opportunity to be heard and it is an "opportunity which must be granted at a meaningful time and a meaningful manner." [Citing *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) ]. *Parratt* at 543, 101 S.Ct. at 1917.

■ Here we are presented with a person (whether or not he is a citizen—so the Fourteenth Amendment speaks), a public employee of the University of the State of Illinois who before being fired, was never actually presented with a bill of charges against him nor given any meaningful opportunity to be heard on those charges before he was summarily terminated from his teaching position. Here the governmental interest in expediated discharge simply does not come into play, nor is there any reason in the evidence before me that would cause expedition to outweigh the severity of injury to his career or his position. *See Board of Education v. Loudermill,* 470 U.S. 532, 543, 105 S.Ct. 1487, 1494, 84 L.Ed.2d 494 (1985).

Upadhya was actually voted out in a meeting between Professor Wu and his advisory committee on May 14, 1986. He was first notified that he would be receiving a terminable one year contract on June 2, 1986, 19 days later. On June 15, 1986, 33 days after the fact, Wu wrote a memorandum to Upadhya informing him that he was being discharged for "insufficient teaching." And even though by then he had informally heard some things about the matter, the memorandum itself contained no explanation of the charge nor anything that could put him on notice as to why the University was firing him. It is true that in the course of this trial the University's witnesses testified to several incidents which they said led to their decision to discharge Upadhya, but the totality of the evidence supports the impression the court, as trier of fact, got, that the evidence never disclosed the true reason. I think that it safely can be said that before state employees on a professional level, who are expected to bring something to their jobs with them that in the first instance required of them specialized preparation at an outlay greater than that otherwise provided by the state to all of its people are "cut-loose" or told to "get out," they are entitled to notice of the charges against them, and to a meaningful opportunity to be heard on those charges by someone other than their accusers, before they can be discharged. *See Cleveland Board of Education v. Loudermill,* supra; *Patkus v. Sangamon–Cass Consortium,* 769 F.2d 1251, 1265 (7th Cir.1985). These requirements are fundamental and cannot be compromised, especially by a state governmental body that has by the words and purpose of the Fourteenth Amendment been admonished to maintain the highest standards of fairness, honesty, and propriety in dealing with all "people." And even as the Court in *Loudermill* noted, "the [governmental] employer shares the employee's interest in avoiding disruption and erroneous decisions …" *Loudermill,* at 544, 105 S.Ct. at 1495.

Legislatively the State of Illinois has made a strong commitment to the concept of an inherent property interest of teachers in their positions as employees of the State's own educational institutions. Its statutes expressly provide a detailed procedure for pre-termination notice and opportunity to be heard to all of its teachers working under the State Board of Education. *See Employment of Teachers,* Chap. 122, 24–12, Illinois Revised States, 1985. As to the State's colleges and universities, the duty to establish "procedures not inconsistent with the law" to provide for the "good government and management of its colleges and universities," has been delegated to the board of governors of the institutions of higher education. *See Board of Education,* Chap. 144, § 1008, Illinois Revised Statutes, 1985. The Supreme Court of Illinois this year in *Duldu-*

*lao v. St. Mary of Nazareth Hosp.*, 115 Ill.2d 482, 106 Ill.Dec. 8, 12, 505 N.E.2d 314, 318 (1987) indirectly addressed the basic problem here when addressing the matter of institutional regulations and handbooks language preserving the traditional power to hire and fire "probationary employees" at will, held that an "employment at will" regulation is merely a "rule of construction" mandating only a presumption that a hiring without a fixed term permits at will firing without notice or without cause—a presumption which can be overcome by a demonstration that the parties agreed otherwise. The implication of this decision is that property interests in continued employment can grow out of the understandings and practices of the parties nevertheless, and permit the institutional employee some degree of pre-termination due process. For, as stated by the Seventh Circuit in the case of *Reed v. Village of Shorewood*, 704 F.2d 943 (1983) at 948: "So we must look behind labels ... and decide whether [it] was 'property' in a functional sense. Since, viewed functionally, property [for purposes of due process under the Fourteenth Amendment] is what is securely and durably yours under state (or as in *Goldberg* [*Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287] federal law) as distinct from what you hold subject to so many conditions as to make your interest meager, transitory or uncertain."

It is not the duty of the court to determine the validity of the University's charges, nor to conclude whether or not Upadhya was in fact a "good teacher." That is not the question. (Even if it were it could not have been answered on the basis of the evidence presented.)

The question is: has Upadhya received due process? The answer is: He has not. The trial record shows that no notice was given prior to the June 16, 1986, memorandum. The evidence shows that Upadhya did not know until the discovery process in this case the full list of charges against him. (Early in discovery he proceeded as though the charge involved was a suggestion that improperly he had had an affair with a woman. Discovery protections were provided. Depositions were taken. Noth-

ing came out in the trial about this idea.) The interview afforded him at his request by the dean of CEMM was not a hearing as such and their discussion did not involve all of the charges which at that date had been made against him. The so-called "grievance procedure" given after receipt of a formal notice of termination was inadequate, and the collateral advice of the grievance hearing officer was ignored by the defendant. And no appeal was heard by the Chancellor.

The following recitation of facts taken from plaintiff's proposed findings of fact and conclusions of law are a relatively accurate statement of the evidence in this case on the question of a hearing as the same is required by procedural due process.

Under the University's structure, the decision to institute non-retention proceedings is left to the discretion of the department head.

On May 14, 1986, Wu called a meeting of the CEMM Advisory Committee which met and voted unanimously to terminate Upadhya's employment. McNallan, Danyluk, R.H. Bryant, Thomas Ting, and Ernesto Inadcochea, were the elected members of the committee; they all met with Wu.

Upadhya was not told that the Advisory Committee would be meeting on May 14, 1986 to consider Wu's decision to fire him.

Upadhya was not invited to and did not attend the Advisory Committee meeting on May 14, 1986.

On May 22, 1986, Wu wrote a document called Recommendation for Non-Retention; it contains the actual charges against Upadhya and the reasons he was being fired. Upadhya was never given or told about this Recommendation for Non-Retention.

Dean Chung and the then Vice-Chancellor of Academic Affairs, Richard Johnson approved the Recommendation for Non-Retention prior to May 28, 1986.

Johnson wrote a letter (dated May 28, 1984) to Upadhya advising him that he

would be issued a terminal contract for the 1986–87 academic year, meaning that he was fired on May 28, 1986, effective August 31, 1987.

Wu did not tell Upadhya the charges contained in the Recommendation for non-Retention. The charge of insufficient teaching was the only official reason ever communicated to Upadhya for his firing in Wu's memorandum of June 16, 1986.

Wu wanted the Recommendation for Non–Retention to appear as severe as possible.

In June, 1986, Danyluk and Bryant gave Wu memoranda they claim records what they had said at the May 14 meeting, and Indacochea gave Wu a memorandum in which he recites events which Indacochea claims took place on June 4, 1986. Upadhya was not given, shown or told about any of these memoranda.

Upadhya met with Chung informally in June 1986; Chung did not tell Upadhya about the Recommendation for Non–Retention or any of the charges contained in it. Chung did tell him teaching was not the real reason he was fired.

In September, 1986, Upadhya appealed the firing to Chancellor Langenberg, asking him for a hearing *de novo*.

While the appeal was pending before Chancellor Langenberg, on September 24, 1986, Dean Chung sent Langenberg a thick package, including a memoranda from the other faculty, and other documents. (Def.Ex. 113) In the memorandum Chung made additional charges against Upadhya.

Neither Chung's memorandum, nor any of the attachments added to it, was ever given to Upadhya, nor was he told about it.

Upadhya was not able to and never did respond to Chung's charges while Langenberg was considering Upadhya's appeal.

Chancellor Langenberg did not hold any hearing and on October 6, 1986, Langenberg denied Upadhya's appeal.

## CONCLUSION

In conclusion, I find that Upadhya has been injured in that he has been denied the right of due process of law to which under the Constitution of the United States he is entitled. I find that if he is terminated on August 31, 1987, Upadhya will have been irreparably harmed because he will have lost the benefits of his two year effort invested in continuing research and in support of his teaching directed toward achieving tenure. He will lose the continued use of the $120,000 laboratory he built at the University and the benefits it would serve in his own professional growth. He will also lose his reputation and standing in his academic and professional community, particularly in view of the entry that will have to be made on his resume when accounting for the years 1984–1987. His inability to find another job since being notified of his termination in May of 1986 will continue. I further find that the University will suffer no significant cost in time or money if it is required to back-up and provide Upadhya with the full of the due process to which he is entitled.

Wherefore, it is ordered as follows:

1. Judgment is entered for the plaintiff and against the defendant.

2. The defendant is ordered to continue the plaintiff in his present position in its employ until it shall have given him a complete and constitutionally sufficient application of due process of law as hereinabove set forth.

3. This cause is set down to September 14, 1987 at 2:00 p.m. for hearing as to any further orders of judgment or relief.